**MINSTAR ACQUIRING CORP., and Minstar, Inc., Plaintiffs,**

v.

**AMF INCORPORATED, W. Thomas York, William H. Bricker, Barbara Knowles Debs, Raymond A. Hay, John L. Huck, Roy M. Huffington, John F. McGillicuddy, Francis C. Rooney, Jr., Ralph S. Saul, and William P. Sovey, Defendants.**

**No. 85 Civ. 3800 (MJL).**

United States District Court, S.D. New York.

June 6, 1985.

As Amended June 18, 1985.

---

Weil, Gotshal & Manges, New York City, for plaintiffs.

Davis Polk & Wardwell, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

This is an action to enjoin various defensive measures taken by defendants to thwart plaintiff's tender offer and to force curative disclosure on AMF's 14–d(9) statement. Presently before the Court is plaintiff's motion for a preliminary injunction. For the reasons stated below we grant the injunction.

## BACKGROUND

The recent years have seen a massive proliferation of corporate takeover battles. The manner in which these contests are waged has undergone dramatic changes. The case at bar asks the Court to determine the propriety of various actions taken by the target corporation to thwart a hostile tender offer.

This case has a tortured procedural history. The plaintiffs in the instant action are Minstar Inc. and Minstar Acquiring Corporation (hereinafter collectively referred to as "Minstar" or "plaintiff"). Minstar Inc. is a Minnesota Corporation which is engaged in various lines of business, including boat manufacture and the moving industry. Minstar Acquiring Corporation is a New Jersey Corporation which is wholly owned and controlled by Minstar Inc. Apparently, the only purpose for the existence of Minstar Acquiring is to purchase other companies. Both companies are controlled by a group headed by Minstar Chairman Irwin Jacobs ("Jacobs" or "Jacobs group").

The defendants are AMF incorporated ("AMF"), its Chairman W. Thomas York ("York") and various other officers and directors of AMF. AMF is also a New Jersey corporation, therefore it is undisputed that the New Jersey Corporation Law provides the rule of decision in this case. AMF is also engaged in several lines of business, most of which center around the production of sporting goods, including yachts.

On April 26, 1985 Minstar commenced a tender offer by making the appropriate filings with the Securities Exchange Commission ("SEC"). The tender offer was preceded by a so-called "running start" whereby Minstar beneficially acquired about 7.5% of the outstanding AMF stock. The tender

offer was for 12 million shares of AMF at $23 per share. AMF is currently trading on the market at about $19 per share. If the offer succeeds Minstar will beneficially control about 50.5% of AMF stock.

At the same time Minstar began its tender offer it filed *Minstar v. Abrams,* Civil Action 85–3173 (MJL), in an attempt to have a New York anti-takeover statute declared constitutionally invalid. The Attorney General and AMF stipulated to effective non-enforcement of the statute, thus mooting the question, however AMF counterclaimed alleging that Minstar's SEC disclosure was defective. After Minstar agreed to some curative disclosure, we denied expedited discovery since the exigency had been removed.

Minstar then filed the instant action which we accepted as a related case. This complaint contains three major groups of claims. First Minstar claims that AMF's 14d(9) statement contains false and misleading statements or omissions and thus violates Section 14 of the Williams Act, 15 U.S.C. § 78n(d) ("Williams Act"). Minstar's second claim is that various AMF defensive tactics were illegal as a matter of state law or were *ultra vires* under the corporate charter. Finally, Minstar contends that the defense tactics constitute a breach of AMF's directors' fiduciary duty as a matter of State law.

As an initial observation we note that this entire action resembles somewhat "the tail wagging the dog." The basis of federal jurisdiction is predicated on the violation of the Williams Act, yet most of plaintiff's claims and the relief which it seeks sound in state law. While we believe that determination of the state law causes of action is a proper exercise of our pendent jurisdiction, in the future, we may, in an appropriate case refrain from hearing such claims. *See Federman v. Empire Fire and Marine Insurance Co.,* 597 F.2d 798, 809 (2d Cir.1979). In this case the extent of the plaintiff's state law causes of action was not clear until the eve of the hearing and the closing of the tender offer. Under these circumstances, the interest of justice

required that we retain jurisdiction. However, we believe that matters of state law are best left to the sound judgment of the state courts.

None of this should be read to say that the plaintiff's Williams Act claims are improper. We note that the SEC has in the past recommended legislation to bring control of defensive tactics within the ambit of federal regulation. That the Congress has chosen not to adopt such legislation is of course wholly within its discretion. It must be remembered, however, that the Williams Act in no way creates any substantive right to challenge the actions of boards of directors; rather it is simply a disclosure statute. *Buffalo Forge v. Ogden,* 717 F.2d 757 (2d Cir.1983), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724.

Although the case is marshalled around the Williams Act, plaintiff's battle cry is "breach of fiduciary duty," while defendants march to the sound of the business judgment rule. The Williams Act claims, in large part, turn on the validity of the defensive tactics taken by the Board, an issue of corporate governance regulated by state, not federal law. Thus we begin with the state law claims.

The vernacular of tender offers is filled with colorful terms such as "poison pills," "white knights" and "scorched earth." Mr. Jacobs is labeled a "raider." A "raider" is known for his "hostile" takeover attempts. As such AMF generally characterizes him as a bad person. AMF believes that the structure of the present tender offer is especially hostile. It refers to the take-over as a "front-end loaded, two-tier" tender offer. Under an offer such as this, the offeror acquires a bare majority of the stock in the first step. Once in control, the offeror often makes significant changes in the target such as selling the "crown jewel" or stopping dividend payments. The offeror then undertakes a second stage offer in which it buys the remaining shares. It is alleged that the second stage offer price is often below the first stage price.

Moreover the second stage is often purchased with so-called "junk bonds."

AMF argues that such two-tiered offers are by their nature always unfair and "irresistibly coercive." It argues that the "freeze-out" of the non-tendering shareholders through suspension of dividends, dries up any market for the non-tendering stock thus depressing the price of such stock far below its "real" value. AMF argues, that the shareholders are placed in what it calls a "prisoner's dilemma."

Under the "prisoner's dilemma," individual dispersed shareholders are forced to tender their shares into a partial offer regardless of whether they think the offer being proposed gives them full and fair value. They act out of fear that other shareholders, with whom they cannot communicate or collaborate, will tender and thus enable the bidder to relegate the non-tendering shareholder to the distinctly less attractive position of minority shareholder in a company controlled by a majority interest.

Minstar counters that a two-tiered offer is not in any way illegal under federal law or the applicable New Jersey state law. Moreover, Congress and the SEC have consistently held the view that tender offers benefit shareholders by "offering them an opportunity to sell their shares at a premium, and act as a guard against the entrenchment of management and thus, it is in the shareholders' interest to allow them the opportunity to consider and act on tender offers." SEC's Brief as *Amicus Curiae* in the case of *Moran v. Household International Inc.*, attached as Appendix "B" to plaintiff's memorandum. *See also,* Economic Report of the President, attached as Appendix "A" to the plaintiff's memorandum; *Edgar v. MITE Corp.,* 457 U.S. 624, 632–33, 102 S.Ct. 2629, 2635–36, 73 L.Ed.2d 269 (1982).

The Williams Act was intended to provide shareholders with full and fair disclosure of material information upon which to make an informed decision. "Congress felt that it was for fully-informed investors to decide whether takeover offers were fair and equitable and that the investors should be free to make their own decisions." *Buffalo Forge Co. v. Ogden Corp.,* 717 F.2d 757, 760 (2d Cir.1983), *citing Edgar v. Mite,* 457 U.S. 624, 640, 102 S.Ct. 2629, 2639, 73 L.Ed.2d 269 (1982).

The AMF board met to consider the Minstar offer and unanimously rejected it. The alleged rationale for the rejection was that, taken as a whole, the offer was inadequate and not in the best interest of the corporation or its shareholders. The Board stated that it was concerned with the detrimental effect a two-tiered takeover would have on the non-tendering shareholders. Specifically, it believed that the remaining shareholders would be unable to realize the fair value for their shares. Minstar asserts that the Board of AMF was concerned with entrenching itself in office, or else leaving AMF in ruins if forced out.

At the AMF board meetings between May 2, 1985 and May 9, 1985 the Board considered and discussed the implementation of various defensive tactics designed to thwart the Minstar takeover bid. In its 14d–9 Schedule AMF unveiled a series of defensive tactics designed to prevent the takeover.

These defensive tactics fall into two general categories. One is the so-called "poison pill" or Rights Plan. The other is the so-called "scorched earth" policy.

## AMF'S RESPONSE

### A. *AMF's Scorched Earth Plan*

With the Minstar tender offer looming on the horizon, the AMF board on April 23, 1985 decided to amend the company's stock option and Long Term Incentive Plan. The original plan authorized a Committee composed of three or more directors to grant to key employees favorable options to purchase stock based upon stated performance objectives, over a particular period. The amendments adopted on May 9th, dropped the performance requirements and provided that the price at which stock appreciation rights would be exercisable would be either, the highest price paid per share in

any tender offer in effect at any time during the sixty day period immediately prior to the exercise of such rights or the highest sale price per share during such sixty day period. The effect of this amendment is to create favorable option prices derived from market events, rather than from employment based achievements. Moreover, the plan expanded the definition of events for triggering the option to include the consummation of a tender offer. AMF's board asserts that the purpose for these amendments was to calm employee fears created by hostile takeover attempts and to safeguard rights and benefits already allegedly promised to AMF employees. Minstar claims that the plan lacks a rational basis in that it provides the optionees with a significant cash benefit without corresponding performance objectives at the expense of AMF and its shareholders. Minstar concludes that the amendments constitute corporate waste.

Also on May 9, 1985, the AMF board approved other measures. One provided a 20% increase in benefits accrued under a previously terminated Retirement Annuity Plan. This change, like all the other amendments, became operative only if a change of control occurs on or before December 1, 1985.[1]

Another measure created the "Severance Allowance Plan" providing for an increase in the severance allowance for certain salaried employees on the corporate staff. The Plan doubled AMF's prior formula of 1½ weeks base pay for each year of completed service. This Plan would become effective only in the event of any involuntary termination during the two year period following a "change in control."

The Board established two trusts to implement the newly-developed plans. The first trust provided the resources for funding the increased retirement benefits. The second trust provided the resources to fund deferred payments under the Rights Plan. The provisions of the trusts provided for revocability by the incumbent Board but, in the event a new Board took control, the new Board would be irrevocably bound by the trusts.

### B. The AMF Rights Plan. ("Poison Pill")

At the board of directors meeting on May 9, 1985 the AMF board declared a dividend of one "Right" per share of its outstanding common stock, as of the close of business on May 20, 1985. Each Right entitled the holder to exchange one share of AMF common stock for a "unit" comprised of one-tenth of a share of a new series of AMF stock designated "Series B Preference Stock" and $5.75 principal share of 14.5% Subordinated debentures, due in 1995. The Indenture covering these Debentures contained certain restrictions including: (1) a moratorium on incurring further debt, except for working capital used in the ordinary course of business and to fund the Rights Plan; (2) a restriction on the sale or transfer of assets of AMF exceeding 1% of Consolidated Adjusted Net Assets, except as conducted in the ordinary course of business; and (3) a prohibition on the making of investments with affiliates of AMF.

In the event of default, the holders of at least 25% of all debentures then outstanding may declare the principal of all the debentures and the interest accrued thereon due and payable. AMF claims that the combined liquidation preference of Series B Preference Stock and the principal amount of the Debenture (per unit) amounts to $23.00.

The Rights assigned are not transferable and may be exercised only during a forty day period beginning on the date that a person acquires 30% or more of the shares of AMF common stock without having proposed a plan to acquire all the remaining shares on terms which are deemed fair by the board of directors. The Rights expire on November 15, 1985 if not triggered prior to that date.

---

**1.** Change of control under the Plan is defined as either any person accumulating beneficial ownership of 30% of the AMF outstanding common stock or displacement of the incumbent board of directors.

In the event the Rights are exercised, the holders of Series B Preference Stock are entitled to receive dividends at an annual rate of 15.5% calculated on the liquidation price of $172.50 per share. The Series B Stock is not redeemable until 1990, and then is redeemable only at a specified premium. The Series B stockholders are not entitled to vote for directors, except if accrued dividends are not paid. In this event the B stock, as a class, may elect two members of the Board. The Rights are redeemable for $.10 per Right by action of the AMF board at any time prior to a change in control, however, upon a change in control they become irredeemable.

The cumulative effect of these defensive tactics is to seriously deter any unfriendly tender offers. Minstar argues that the offeror would acquire a debt-ridden corporation and a new board would be bound to pay dividends, employee benefits and severance pay far in excess of its fiscal capacity.[2] Thus the term "scorched earth" is used to describe what is left of the target company after the "successful" tender offer.

AMF on the other hand argues that the defensive tactics are nothing more than an attempt to assure that any non-tendering shareholders would receive fair value for their stock. In other words, it argues that the Board is, in effect setting the second stage price. Minstar counters that by any reasoned analysis no tender offer would be made in the face of massive forced payments and debt restrictions. The offeror would be left with nothing but smoldering ash. Thus, Minstar claims the defensive tactics do not set a fair price for the second stage, but rather, sound the death knell to the tender offer, thereby denying the shareholders the basic right of tendering for a premium according to market forces. *See* SEC brief of *Amicus Curiae, supra;*

*Cf. Edgar v. MITE Corp.,* 457 U.S. at 639, 102 S.Ct. at 2639.

## DISCUSSION

### *Standard for A Preliminary Injunction*

The standard in the Second Circuit for preliminary injunctive relief requires a showing of: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Wali v. Coughlin,* 754 F.2d 1015, 1026 (2d Cir. 1985)[3] *Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979); *Accord Arrow United Industries, Inc., v. Hugh Richards, Inc.,* 678 F.2d 410, 413–14 (2d Cir.1982); *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78–79 (2d Cir.1981).

We have no trouble concluding that if the tender offer is defeated due to defensive tactics which are in fact illegal, the plaintiff will suffer irreparable harm. However, we believe that plaintiff must meet the "likelihood of success" test because the balance of hardships weighs evenly.

### A. *Illegality or Ultra Vires Acts*

 We begin by considering whether the AMF board exceeded its authority as a matter of New Jersey law or its corporate charter when it adopted the defensive tactics. If the Board had no power to do what it did then we must strike the acts regardless of the Board's motive or justification in acting.

Minstar's primary argument in this regard is that the adoption of the Rights Plan was illegal. It puts forth five grounds, however, the arguments in fact overlap.

Minstar argues that the Rights Plan discriminates against post May 20th stock-

---

**2.** At oral argument the parties disagreed as to the corporation's ability to pay the dividend. However, since we preliminarily enjoin the Rights Plan on legal grounds, we need not reach the factual issue of whether it was adopted in violation of the Board's fiduciary duties.

**3.** Defendants argue that plaintiff must meet the "substantial likelihood" standard. We need not decide which standard applies since we find that Minstar has meet the more stringent standard of *Wali.*

holders. The Rights are not transferable. Thus, only the shareholders as of May 20, have any right to convert their stock. AMF contends that it did not discriminate against Minstar because, to the extent that Minstar owned any stock on May 20th, it too may convert. We find AMF's argument unpersuasive.

The May 20th date was not simply the record closing date as in the case of the usual dividends declaration. Normally, the record date closes the class of shareholders eligible to receive the dividend. Thereafter, the shareholder may transfer his dividend if he so chooses. The non-transferability of the Rights in the instant case is the fatal flaw.

We believe that as a matter of New Jersey law this type of discrimination between holders of a class of securities is illegal.[4] In *Mesa Petroleum Co. v. Unocal Corp.,* (Del.Ch.1985), 493 A.2d 946 (Del. Sup.1985) the Chancery Court held that this type of discrimination is illegal. Slip Op. at 19. While the Delaware Supreme Court reversed the Chancery Court's opinion, we believe that the courts of New Jersey would not follow the Appellate Court of Delaware. *Asarco Inc. v. MRH Holmes A Court,* 611 F.Supp. 468 (N.J. 1985), is particularly instructive. In that case Judge Debevoise of the United States District Court for the District of New Jersey stated at p. 1260–1261:

I am not persuaded by the logic of the opinion of the Delaware Supreme Court reversing the Chancery Court and do not believe it would be followed in New Jersey.

*Id.,* referring to, *Baker v. Providence and Worcester Co.,* 364 A.2d 838 (Del.Ch.1976).

A second ground for invalidating this Plan is that the non-transferability of the Rights constitutes an unreasonable restraint on the alienability of the underlying common stock. Under normal circumstances Rights have real value when exercised in conjunction with common stock. However, the transfer of the common stock herein cannot be accomplished with the Rights, thus the value of stock in the hands of a post-May 20th purchaser is significantly reduced. Moreover, the seller would destroy much of the value of the Right by transferring the stock. Under these circumstances we find that the non-transferability of the Right is an unreasonable restraint on alienation.[5] *See Hill v. Warner, Berman & Spitz,* 197 N.J.Super. 152, 484 A.2d 344 (1984).

We must infer that the effect of the Rights, as now constituted, is to restrict the transferability of the underlying stock. Therefore AMF's arguments that the restraint only limits the Rights is unpersuasive. Moreover, despite the rationalizations of the AMF board, this effect seems to have been clearly intended.

4. We recognize that the Board was empowered to issue as a dividend these rights to all common shareholders pursuant to the corporate charter. However, the non-transferability of the rights constituted a division of the common stock into two classes (pre-May 20/post-May 20). The bundle of rights possessed by pre-May 20 shareholders is significantly greater than those that would be possessed by purchasers of the common stock on the open market, post-May 20. We consider this discriminatory reclassification of the common stock as improper. We believe that the Board may not do this without shareholder approval under New Jersey Law. N.J.Stat.Ann. § 14A:9–1(2)(f); 14A:9–2(4). *See Asarco.*

5. At the hearing on the motion, AMF's counsel argued that the restrictions on transfer were specifically authorized by New Jersey Statute. They first cited N.J.Stat.Ann. 14A:7–7(1). We hold that § 7–7(1) is inapplicable. It appears that § 7–7(1) merely requires that any restraint on transferability appear on a certificate legend. That section does not substantively authorize restrictions.

Counsel next asserted that § 14A:7–12(2) authorizes the restriction. While we agree that § 7–12(2) does authorize some restraints on alienation, it does not authorize the type of restriction at issue here. To the contrary, that section specifically indicates that a restraint must be "reasonable." We can find no authority in New Jersey law or the common law which authorizes a complete, absolute restraint on alienation. We therefore hold that the restriction is unreasonable. See *Allen v. Biltmore Tissue,* 2 N.Y.2d 534, 542, 161 N.Y.S.2d 418, 423, 141 N.E.2d 812, 817 (1957) ("As the cases thus make clear, what the law condemns is ... an effective *prohibition* against transferability" [Emphasis in original] ).

We note that AMF claims the Rights are intended to protect the non-tenderors, however, anyone who purchased AMF common on the market would not be protected. In fact such a shareholder is distinctly more disadvantaged due to the Rights Plan. He would be unable to seek the "protection" of Class B stock, nor would he be part of the Minstar majority. Because many of the non-tendering shareholders would convert to Class B, the open market purchaser would be left out in the cold, without any large block of similarly situated non-tendering shareholders.

Finally we note the Rights Plan has the impermissible effect of vesting a veto power over any merger in the hands of the non-tendering May 20th stockholders. As discussed above only May 20th stockholders can become Class B shareholders. The Rights Plan requires approval of a merger by the Class B stock as a class, thus the May 20th shareholders may have effective control over any merger. The only way Minstar could ever merge would be to conduct a second tender offer after the Rights have been exercised to gain control of now non-existent Class B stock. We believe that such major changes in structure and voting rights may only be approved by the shareholders. The Board's unilateral action, in this Court's opinion, was improper under New Jersey law. We need not reach Minstar's other grounds for holding the poison pill illegal nor need we reach the question of whether its adoption was pursuant to a valid corporate purpose.

Accordingly we will preliminarily enjoin the use of the Rights in any way. Because the debentures are an integral part of the Rights Plan we also enjoin their issuance. While we have grave doubt that the restrictions on incurring new debt and the restraint on the transfer of more than 1% of AMF's assets may be validly accomplished by the unilateral action of the Board, we also do not reach the question of whether the restraints adopted were for a valid corporate purpose. We simply hold that the debentures, with their restraints, were issued as part of the Rights Plan and thus are illegal. We will leave the question of whether similar debentures with similar restraints are in themselves invalid for another day.

### B. Breach of Fiduciary Duty and the Business Judgment Rule

A far more difficult issue is whether the "scorched earth" devices constitute a breach of the Directors' fiduciary duty. As noted above we do not reach the question of whether the poison pill breached their fiduciary duty.

Stated simply Minstar claims that the clear-cut purpose of the poison pill and scorched earth is to stop Minstar's tender offer from succeeding and thereby entrench the current Board and Management. Just as simply stated, AMF claims that the Board acted to protect the shareholders as a whole and is therefore protected by the business judgment rule. N.J.Stat.Ann. § 14A:6–1.

While the parties' claims may be stated simply the issues raised by those claims are extremely complex. The business judgment rule is a rule of judicial restraint which holds that courts will not inquire into the business judgment of directors who are acting without self-interest and in good faith. As an initial matter we question whether it is appropriate to apply the rule in the context of defensive tactics. The rule was developed to protect directors' judgments on questions of corporate governance. Questions like "should we buy a new truck today?" or "should we give Joe a raise?" are simplistically, types of business judgments which the rule was developed to protect. Courts have no place substituting their judgments for that of the directors.

Defensive tactics, however, raise a wholly different set of considerations. The problem is that defensive tactics often, by their very nature, act as a restraint on business purposes. Therefore, the application of the business judgment rule in this context seems, to us, questionable, however, the weight of authority dictates that

the rule be applied.[6] *See Asarco* (holding that the business judgment rule applies to tender offer defensive tactics.); *See also,* N.J.Stat.Ann. § 14A:6–1, *Treadway Co. v. Care Corp.,* 638 F.2d 357 (2d Cir.1980). However many of the cases which have heretofore dealt with the issue, have applied a variant of the business judgment rule. *See e.g., Moran v. Household Internat'l,* 490 A.2d 1059 (Del.Ch.1985) (appeal pending); *Norlin Corp. v. Rooney Pace Inc.,* 744 F.2d 255 (2d Cir.1984) (raising the inference of self-dealing); *see generally,* Block, Barton and Radin, *Business Judgment Rule Changes,* N.Y. Law Journal, May 28, 1985, p. 25 col. 6.

The term "scorched earth" is a military term—in fact the analogy to war seems to run through much of the take over vernacular. When a battle is lost and a force must retreat from its position, it burns the town and fields, so that the conquerors get nothing for their troubles but scorched earth. In tender offer terms, the scorched earth occurs when the defending directors purposefully injure the corporation. This is most often accomplished by riddling the corporation with debt and exhausting its credit. Thus the newly acquired corporation must service a long term debt which has no current value to the company, while it is unable to borrow the money it needs to function.

In the instant case the scorched earth tactic alleged included the creation of trust funds which were to remain revocable and unfunded until there is a shift in control of the corporation. On this occurence the trust becomes irrevocable. Minstar argues

that the cost of these tactics is so high that AMF will operate at a loss for years.

■ Minstar argues that the purpose of the scorched earth was simply to entrench current management and the Board. It argues that this is clearly improper and that the business judgment rule should not protect the Board from this alleged misconduct. *See Treadway Cos. v. Care Corp.,* 638 F.2d 357 (2d Cir.1980); *Michelson v. Duncan,* 407 A.2d 211 (Del.1979); *Singer v. Magnavox,* 380 A.2d 969 (Del.1977), *overruled on other grounds, Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983); *Condec Corp. v. Lunkenheimer Co.,* 230 A.2d 769 (Del.Ch.1967); *Royal Industries, Inc. v. Monogram Industries, Inc.,* [1976–1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95, 863 (C.D.Cal.1976). When directors use corporate powers to preserve their control, they become interested directors and have the burden of proving the fairness and propriety of the challenged transaction, *Norlin Corp. v. Rooney, Pace, Inc.,* 744 F.2d 255, 264–65 (2d Cir.1984); *Asarco, Inc. v. MRH Holmes A Court,* 611 F.Supp. 468 (D.N.J.1985); *Bennett v. Propp,* 41 Del.Ch. 14, 187 A.2d 405, 409 (1962). The Second Circuit, interpreting New Jersey law, stated in *Treadway:*

In nearly all the cases treating stock transactions

intended to affect control, the directors who approved the transaction have had a real and obvious interest in it: *Their interest in retaining or strengthening their control of the corporation.* It is this interest which causes the burden of proof to be shifted to the directors, to

---

**6.** Corporate governance is predicated upon a division of powers between the shareholders and the board of directors. The two basic attributes of common stock ownership are: (1) the right to vote; and (2) the right to make independent decisions concerning the purchase or sale of stock. The duty owed to the shareholders by the board of directors is: (1) the duty of care; and (2) the duty of loyalty. See *Norlin Corp. v. Rooney Pace Inc.,* 744 F.2d 255 (2d Cir.1984).

The duty of care implicates the exercise of business judgment in the lawful and legitimate fur-

therance of corporate purposes. The duty of loyalty is a prohibition against violation of the fiduciary relationship, *i.e.,* self-dealing. The Right of a shareholder to sell his stock is a private transaction between a willing seller and a willing purchaser and in no way implicates the business judgment rule. Therefore, a board of director's assertion of a unilateral right, under the business judgment rule, to act as a surrogate for the shareholder's independent right of alienation of his stock is troublesome. However, because of our holding we need not reach this issue.

demonstrate the propriety of the transactions.

638 F.2d at 382 (emphasis added).

In countering Minstar's argument AMF relies heavily on *Johnson v. Trueblood,* 629 F.2d 287 (3d Cir.1980). That case held that a showing of "a" motive to retain control, without more is not actionable. However *Johnson* cannot be read to require that the only motive be self preservation, rather it requires that there must be a "showing from which a fact finder might infer that impermissible motives predominated in the making of the decision ..." 629 F.2d at 292.

In this regard we find the case of *Norlin Corp. v. Rooney Pace Inc.,* 744 F.2d 255 (2d Cir.1984) to be very instructive. In *Norlin* the Second Circuit raised a "strong inference that the purpose of [the challenged acts] was not to benefit the employees but rather to solidify management's control ..." 744 F.2d at 265, thus the burden was shifted to the directors to show that the transaction was fair and reasonable. *Id., citing Johnson v. Trueblood* (Rosenn J. concurring and dissenting).

Under the facts of this case we believe that at least as strong an inference is raised. This inference is based upon the fact that the severance benefits, like the other defensive tactics, are triggered only by the change in control. Minstar points out that AMF has already announced a long term plan which calls for substantial staff reductions in some areas. Thus, an employee who is to be terminated pursuant to the Plan, will receive twice as many severance benefits, if Minstar takes over, even though the decision to terminate him was already made by the present AMF board. AMF claims the changes are "prudent steps designed for the most part to safeguard rights and benefits already earned by and owed to AMF employees" (defendants' memorandum at 42). It goes on to argue that the increases were made to bring AMF in line with "severance plans in effect at other companies." *Id.* at 44. If this was in fact the true justification

then conditioning the program on a change in control would be unnecessary.

AMF attempts to distinguish *Norlin* on the ground that it involved "egregious facts."

The only viable distinction between *Norlin* and the case at bar is that in *Norlin* the board's control was assured forever, whereas in the instant case the Rights are dissolved, if not triggered in six months. We find this to be an insufficient distinction, because AMF's board could simply extend the Rights time and time again. The time limit also tends to support the inference that the scorched earth tactics were intended only to thwart tender offers. If AMF's board's justification was to protect employees and the like, there would be no reason for the durational limitation.

Moreover, it is important to note that the *Norlin* Court held that neither the "unsavory [business] reputation" of the tender offeror nor the need to gain time for the target to find a white knight justified "a wholesale wresting of corporate power from the hands of the shareholders." 744 F.2d at 276.

■ Accordingly, we hold on the record before us that the conditioning of the various scorched earth tactics on a change in control of AMF properly raises a strong inference that AMF's board acted only to entrench itself. This inference is sufficiently strong to shift the burden to the directors under the business judgment rule. Nothing in this holding should be read to say that the same type of severance benefits and employee rights would not be proper exercises of business judgment if granted, unconditioned on a change in control of the corporation.

## C. *The Williams Act Claim*

As noted earlier this is a case of the tail wagging the dog. Minstar makes many specific claims that AMF's 14d–(9) is false and misleading, however, since we are preliminarily enjoining AMF's defenses, mounted in response to the tender offer, AMF's 14d–(9) disclosure concerning the

effects of its actions is necessarily no longer correct. Accordingly there is no need for us to determine if the statements were correct when made. This is not to say that the Williams Act claims were not valid viable federal claims in their own right, but simply that the claims are mooted. Therefore AMF is ordered to file a new 14d–(9) statement.

## CONCLUSION

Plaintiff has demonstrated irreparable harm and a likelihood of success on the merits. A preliminary injunction shall therefore issue in accordance with this opinion. The parties are to submit proposed orders of preliminary injunction by 10:00 a.m. tomorrow.

It Is So Ordered.