**INTERNATIONAL INSURANCE CO., Plaintiff,**

v.

**Alfred M. JOHNS, et al., Defendants.**

**No. 85–0391–CIV.**

United States District Court,
S.D. Florida.

May 9, 1988.

Bruce G. Hermelee, Karon, Morrison & Savikas, Miami, Fla., Deborah J. Fish, Karon, Morrison & Savikas, Ltd., Chicago, Ill., for plaintiff.

Jerome A. Pivnik, Britton, Schantz & Schatzman, Miami, Fla., Lewis R. Mills, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., for defendants.

## FINAL ORDER, FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARCUS, District Judge.

This action was brought by Plaintiff, International Insurance Company, seeking a declaratory judgment that it has no obligation in connection with a claim under a director's and officer's liability insurance policy. The Defendants, insureds under the insurance policy, have counterclaimed seeking a declaration that Plaintiff is liable under the policy as well as reimbursement for their losses. Specifically, the Defendants seek to be reimbursed under the insurance policy for the amount that was expended in the settlement of a shareholder's derivative action brought against the directors of Southeast Florida Banks, Inc., alleging corporate waste in the creation of a "Golden Parachute" plan, and consulting agreement which provided for payments to certain individuals upon the merger or acquisition of Southwest Florida Banks, Inc. This matter was tried before the Court without a jury, and pursuant to Rule 52(a), Federal Rules of Civil Procedure, we make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. The Plaintiff, International Insurance Company ("International") is a corporation organized under the laws of the State of Illinois and has its principal place of business in that state.

2. Each Defendant is a citizen and resident of the State of Florida, and a former director and/or officer of Southwest Florida Banks, Inc. ("Southwest").

3. The amount in controversy, exclusive of interest and costs, exceeds the sum of ten thousand dollars.

4. On or about December 10, 1982, the Plaintiff issued its policy number 524–015629–2 (the "Policy"), in which it agreed to indemnify Southwest and its officers and directors against certain losses and expenses, subject to certain exclusions.

5. During all relevant periods prior to June 1, 1984, the Defendants Alfred M. Johns, James W. McFadden and Richard W. Sherman were officers and directors of Southwest. Defendants Thomas v. Ogletree and G. Paul Whorton were officers of Southwest. All Defendants are insureds within the meaning of the Policy.

6. The claims asserted in this action arose during the policy period, and timely notice of the claims was given to International.

7. Southwest was incorporated under the laws of Florida in 1972. During the years 1972 through 1975, the bank assembled a management group which included Mr. Johns, the chairman and chief executive officer; Mr. Sherman, the president and chief operating officer; Mr. Ogletree, the treasurer and chief financial officer; Mr. McFadden, chairman of the finance committee and president of the First National Bank in Fort Meyers, Florida; and Mr. Whorton, Mr. Sherman's principal assistant.

8. Under the direction of this management group, Southwest experienced substantial financial growth, a high rate of return and rapid expansion. The consolidated total assets of Southwest was $226,000,000 in 1972; $311,000,000 in 1975; and $1,400,000,000 in 1982. The net income of the company increased from $1,900,000 in 1972 to $2,400,000 in 1975 to $14,200,000 in 1982. Net income declined to $12,200,000 in 1983.

9. In 1977 Southwest's board of directors adopted a five-year bonus plan for key executives. The payment of the bonuses were linked to the earnings per share of the corporation. Payments were made pursuant to this plan during each of the five years that it was in operation.

10. In 1982 the board of directors of Southwest authorized a new Management Incentive Compensation Plan for two of its key executives, Messrs. Johns and Sherman. Although 50,000 units were awarded to each recipient, the payments were never made, and the Management Incentive Compensation Plan was canceled in 1983 when the Performance Incentive Plan was adopted.

11. By the end of 1982 Southwest's management recognized that Southwest had become an attractive takeover target and that someone could acquire a controlling block of Southwest's stock by an unfriendly tender offer. The management was informed by its investment banker, the First Boston Corporation, late in 1982 that the bank could be acquired easily because a large amount of its common stock was held by institutions likely to approve a change for modest improvements in earnings, and because there had been a recent substantial increase in the number of banking acquisitions. These views were communicated to Southwest's directors in early 1983. A number of key officers and employees expressed considerable concern about the likelihood and consequences of a merger.

12. On March 21, 1983, the Board of Directors of Southwest resolved to establish a Performance Incentive Plan (the "Plan").

a. The Plan provided for the creation of 400,000 "units" which had the value of $10.00 per unit.

b. Officers and full-time employees of Southwest and/or Southwest's subsidiaries were eligible to be awarded units.

c. Payment of the dollar value of the units would be made under the following conditions:

1. Payment was to be made to participants five years after the award of the units; or

2. Payment would be made prior to the five year period if a change of control of Southwest occurred; however,

3. The Chairman had the power to authorize payments of up to 100,000 units after three years from the date of the award.

d. The Plan was administered by a committee of three directors (the "Committee"), which made the award of units to the Chairman of the Board and recommended to the Chairman other persons to receive awards.

f. The Chairman made the award of units to all participants except himself.

13. At the time the Plan was adopted there was no agreement to merge Southwest with any other corporation. However, the management believed that a merger or acquisition was very probable within five years.

14. The stated purpose of the Plan was that "[b]y providing additional but contingent and deferred compensation, it is intended to induce officers and management employees of unique importance to the Company to remain in its employ during the critical next five years, and to minimize their concerns about the impact on their own financial futures of any potential acquisition of the Company." [Defendants' Exhibit 7].

15. The Plan was adopted by unanimous vote on July 20, 1983, with fifteen directors voting. Messrs. Johns, Sherman and McFadden voted to approve the Plan, and they were also recipients under the Plan. The other directors were neither officers nor employees of Southwest or its subsidiaries.

16. The following awards were made under the Plan:

| | |
|---|---|
| Alfred M. Johns | 100,000 units |
| Richard W. Sherman | 100,000 units |
| James W. McFadden | 50,000 units |
| Thomas V. Ogletree | 40,000 units |
| G. Paul Whorton | 40,000 units |
| Mario Marchese | 25,000 units |
| John W. Gibbs | 25,000 units |
| Wayne Stanhouse | 20,000 units |

17. No provision in the articles of incorporation or in the bylaws of Southwest limited the power of its board of directors to fix the compensation of its officers or directors.

18. On October 25, 1983, the board of directors of Southwest approved, subject to regulatory and shareholder approvals, a merger of Southwest with and into Landmark Banking Corporation of Florida ("Landmark").

19. One of the provisions of the Agreement and Plan of Merger approved by the board of directors of both corporations authorized Southwest to enter into a consulting agreement (the "Agreement") with Mr. Johns for a five-year period with annual compensation of $225,000. [Defendants' Ex. 10 ¶ 8(d)].

20. The Agreement was proposed to accomplish two purposes. First, the merged corporation wanted Mr. Johns to be available for consultation and to serve as a director for five years. Second, the Agreement was meant to assure that Mr. Johns would not establish any employment relationship with another bank or savings institution without the approval of the board of directors of the merged corporation.

21. On or about December 12, 1983, Southwest and Landmark mailed a joint proxy statement to their shareholders. The joint proxy statement described the two corporations and the terms of their proposed merger, including the proposed consulting agreement between Southwest and Mr. Johns. It also described the Plan and the payments to be made thereunder.

22. On January 10, 1984, each of the participants in the Plan, in accordance with the terms of the Plan, were paid by Southwest an amount equal to $10 for each unit previously awarded to that participant. These amounts were placed in escrow to be returned to Southwest if its merger with Landmark failed to be consummated, or to be paid to the participants upon the completion of that merger.

23. On January 12, 1984, a special meeting of the board of directors was held to address the concern raised by one of Southwest's shareholders, Mr. Cyrus G. Bispham. At that meeting, the Board affirmed, approved, and ratified the Plan and the awards made under it. Specifically, the Board noted at that time that the Plan had achieved its purpose in keeping the management group together up to the time of the merger; that a change in the Plan at this point might result in litigation initiated by those who relied upon the payment of the awards; and that a withdrawal of the Plan could effect the company's credibility with its present and future employees, as well as making the recruitment of highly qualified executives more difficult in the future.

24. On January 19, 1984, the shareholders of both Southwest and Landmark voted to approve the merger.

25. On or about January 31, 1984, a shareholder of Southwest, Robert I. Strougo, filed a shareholder's derivative action in United States District Court for the Middle District of Florida against all of

Southwest's directors and those officers and employees who received awards under the Plan. *Strougo v. Baker*, No. 84–19–FTM–17. The complaint alleged that the Plan and Agreement "served no corporate purpose and are a gift and dissipation of Southwest's assets." [*Strougo* Complaint ¶ 13, Defendants' Ex. 14]. Plaintiff sought judgment in favor of Southwest for "monies improperly and unlawfully awarded."

26. International received timely notice of the claims asserted in the *Strougo* action.

27. On or about April 25, 1984, Southwest entered into a consulting agreement with the Defendant Alfred M. Johns. The duration term of the Agreement was five years and provided for compensation of $225,000 per year. By the terms of the Agreement, Mr. Johns agreed to serve on the board of directors when asked to do so; to be available for consultation; and not to become associated with other banking institutions without the prior consent of the board of directors of Landmark.

28. On June 1, 1984, the requisite regulatory and shareholder approvals having been obtained, the merger of Southwest into Landmark was consummated and the separate existence of the Southwest ended. Thereafter the payments under the Plan were made as follows:

| | |
|---|---|
| Alfred M. Johns | $1,000,000 |
| Richard W. Sherman | $1,000,000 |
| James W. McFadden | $ 500,000 |
| Thomas V. Ogletree | $ 400,000 |
| G. Paul Whorton | $ 400,000 |
| Mario Marchese | $ 250,000 |
| John W. Gibbs | $ 250,000 |
| Wayne Stanhouse | $ 200,000 |

29. On or about February 25, 1985, the parties to the *Strougo* case entered into a settlement agreement. The settlement was approved by the Court on April 30, 1985 and consummated in June 1985. The terms of the agreement called for Mr. Strougo to dismiss the action in exchange for the Defendants' return to Landmark of $600,000 of the $4,000,000 awarded under the Plan, as well as a reduction in the period of Mr. John's Agreement from five years to two and one-half years.

30. The Defendants disclosed the terms and conditions of the settlement of the *Strougo* case to International. Counsel for International notified Defendants' counsel that it had no objection to the fact of the settlement of the *Strougo* case. This notification contained an express reservation of International's right to contest coverage.

31. The Defendants in the *Strougo* case, other than Messrs. Johns, McFadden and Sherman assigned to Johns, McFadden and Sherman whatever claims against International arising out of the *Strougo* litigation that they may have had under the Policy. In consideration for the assignments, the assignees paid the costs of the settlement and the cost of defending the *Strougo* litigation.

32. International paid the pro-rata share of the costs of defending the *Strougo* action of those defendants not named in the case at bar. The total cost of the defense was $82,794.31 and International paid $40,-615.08 of that amount under the Policy to the Defendants.

33. Defendants have demanded International indemnify them against the payments made in the *Strougo* case. International has refused to do so.

## CONCLUSIONS OF LAW

1. Plaintiff, International, has brought this action against Defendants Alfred M. Johns, James W. McFadden, Thomas V. Ogletree, Richard W. Sherman and G. Paul Whorton and seeks a declaratory judgment that payments made by the Defendants in settlement of the *Strougo* litigation are not covered under the Policy. Defendants have counterclaimed and seek a declaratory judgment that under the terms of the insurance contract, they are entitled to be indemnified and reimbursed by International for the amount paid in settlement of the *Strougo* litigation, and that the Plaintiff is obligated to make such payments.

2. Under the terms of the Policy, Plaintiff agreed to pay, on behalf of the insureds, all losses which the insureds are legally obligated to pay for claims brought against them because of wrongful acts. Our initial concern therefore is to deter-

mine whether the payment in the *Strougo* litigation comprise a loss for which this insurance policy provides coverage.

The Defendants bear the initial burden of proof to establish that they have actually incurred a loss under the Policy. To establish a loss under the Policy, the Defendants must prove three elements: first, that the claimed loss is an amount for which they are legally obligated to pay; second that the loss resulted from a claim brought against them; and finally that the claim brought against them was for a Wrongful Act.[1]

The losses claimed in this action became a legal obligation of the Defendants upon the execution of the settlement agreement. Plaintiff in *Strougo* sought judgment against the directors of Southwest for "monies improperly awarded pursuant to the Performance Incentive Plan and the Johns Consulting Agreement." The gravamen of that Complaint was that the Plan and Consulting contract "served no corporate purpose and [were] a gift and waste and dissipation of Southwest's assets." [*Strougo* Complaint ¶ 13, Defendants' Ex. 14]. Under the express terms of the insurance contract, a claim based upon an alleged breach of fiduciary duty falls within the definition of a Wrongful Act. We are satisfied that the *Strougo* litigation presented a claim for a breach of fiduciary duty by the Defendants and, therefore, that that case centered on a Wrongful Act as defined in the Policy.

3. The question remains as to whether the settlement itself constituted a loss within the meaning of this insurance contract. Plaintiff contends that the settlement payments were not losses, but merely unearned bonuses that were returned to the company and that the Defendants simply made less of a profit than they would have if the *Strougo* litigation had not been instituted. However, we are compelled to examine the terms and conditions of the entire Policy to determine the definition of "loss" and may not only examine the plain meaning of the term. *Ellenwood v. Southern United Life Insurance Co.*, 373 So.2d 392, 395 (Fla. 1st DCA 1979).

■ The components of the Defendants' recovery claim present distinct analytical problems. First, the $600,000 settlement payment to Southwest appears to fall squarely within the terms of the insurance contract as an amount which the Insureds were legally obligated to pay for a claim brought against them. This contract term specifically includes settlements and costs. It is patent that the parties to this contract contemplated that Directors would be indemnified for cash payments to resolve actions which would otherwise be covered under the Policy.

Second, the portion of the settlement agreement which halved the duration of Johns' consulting agreement does not fall so obviously within the terms of the contract. Johns suffered no out-of-pocket loss by the reduction in the duration of his consulting agreement. However, it is indisputable that as a result of the settlement Johns had been placed in a less advantageous financial condition. Since, however, the $565,500 reduction in the consulting compensation was simply the loss of future payments, it is somewhat ambiguous as to whether that figure represents an "amount paid." "A contract is ambiguous when its language is reasonably susceptible to more than one interpretation, or is subject to conflicting inferences." *Specialty Restaurants Corp. v. City of Miami*, 501 So.2d 101, 103 (Fla. 3d DCA 1987) (citations omitted). Here we find that it is unclear whether the parties intended the term "paid" to mean only out-of-pocket losses or to also include other types of financial losses. The meaning of an ambiguous term in an insurance contract must be construed against the drafter and in favor of coverage. *See, e.g., Gulf Tampa Drydock Co. v. Great Atlantic Insurance Co.*,

---

1. Wrongful Act is defined in the policy as any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty by the Insureds while acting in their individual or collective capacities, or any matter not excluded by the terms and conditions of this policy claimed against them solely by reason of their being Directors or Officers of the Company.

757 F.2d 1172, 1174 (11th Cir.1985); *Eglin National Bank v. Home Indemnity Co.*, 583 F.2d 1281, 1285 (5th Cir.1978); *Stuyvesant Insurance Co. v. Butler*, 314 So.2d 567, 570 (Fla.1975); *Harris v. Carolina Life Insurance Co.*, 233 So.2d 833, 834 (Fla.1970); *DaCosta v. General Guaranty Insurance Co. of Florida*, 226 So.2d 104, 105 (Fla.1969). We conclude that the fact that Johns will forego receiving $565,500, a sum certain, in consideration for the dismissal of the *Strougo* litigation constitutes a "payment" for a claim brought against him and a "loss" within the context of this Policy. Accordingly, the Defendants have met their initial burden and established that the $600,000 settlement payment and the reduction in the duration term of the Agreement are losses covered by the Policy.

■ 4. Once this initial matter has been proven, the burden of proof shifts to the Plaintiff to establish that the purported losses are within one of the exclusions to coverage. Plaintiff contends that two Policy exclusions apply. Specifically, the policy excludes

> any payment for loss in connection with any claim made against the Insureds ... for the return by the Insureds of any remuneration paid to the Insureds without the previous approval of the stockholders of the Company which payment without such previous approval shall be held by the courts to have been illegal.

[Defendants' Ex. 1, ¶ 5(c), hereinafter the "5(c) exclusion"]. Plaintiff maintains that pursuant to this exclusion, if the shareholders of Southwest were required to approve the Plan in order for it to be legally operative, the $600,000 settlement payment must be excluded from coverage because Southwest's shareholders never approved the Plan. Plaintiff concedes, however, that shareholder approval would not be required if the Plan had been approved by a disinterested board of directors.

The Plan was adopted by a unanimous board of directors with 15 directors voting.

Under the Bylaws of Southwest, Article III, § 9, a majority of the number of directors constitute a quorum, and a majority vote of the directors present at the board meeting is required to constitute an act of the board. *See* Fla.Stat.Ann. § 607.121 (West 1977). Three of the directors voting were beneficiaries under the Plan. Therefore, for the purpose of determining the existence of a quorum and the validity of the ultimate vote, the Plan was approved by a disinterested board.[2] *Corr v. Leisey*, 138 So.2d 795, 798 (Fla. 2d DCA 1962); *cf.* Fla.Stat.Ann. § 607.124(2) (West 1977).

Plaintiff contends that as many as ten of the directors were interested in the Plan because they were officers of Southwest or its subsidiaries and therefore were eligible to receive an award. While officers of Southwest's subsidiaries were eligible to be awarded units under the Plan, there was no evidence that any of Southwest's directors, other than Johns, McFadden, and Sherman were eligible to receive payments under the Plan.

Florida corporations are expressly granted the power, through the acts of their boards of directors, to fix compensation for their directors and officers including the adoption of incentive and other compensation plans. Fla.Stat.Ann. §§ 607.011(2)(i), (m), 607.111(1), (3) (West 1977 & Supp. 1988). Further, there was no provision in Southwest's bylaws or articles of incorporation which required shareholder approval to fix compensation of directors or officers. Accordingly, we find that the Plan was properly adopted by Southwest's board of directors without shareholder approval.

5. We also find that the Consulting Agreement with Johns was not illegal because of the failure to obtain the required shareholder approval. First, the Agreement did not become effective until after the merger of Southwest and Landmark. Second, the terms of the Agreement were outlined in the proxy statement sent to all shareholders of these two companies. The shareholders therefore ratified the Agree-

---

2. Even discounting the votes of the three interested directors, twelve directors unanimously approved the Plan.

ment when they voted in favor of the merger. Accordingly, we find that neither the Plan nor Agreement constitute illegal remuneration and that 5(c) exclusion is inapplicable to this matter.

6. The other Policy exclusion which Plaintiff maintains is applicable states that the

insurer is not liable to make any payment in connection with any claim made against the Insured based upon or attributable to their gaining in fact any personal profit or advantage to which they were not legally entitled.

[Defendant's Ex. 1 ¶ 5(b), hereinafter the "5(b) exclusion"]. Defendants argue that this exclusion is wholly inapplicable to the case at bar. They contend that under the terms of the insurance contract the 5(c) exclusion deals with improperly awarded remuneration and that the 5(b) exclusion necessarily refers to some other type of profit or advantage. Defendants maintain that an interpretation of the 5(b) clause which encompasses duly awarded compensation would render the 5(c) exclusion redundant and meaningless.

Indeed, we note that the terms of an insurance contract should be construed, whenever possible, so as to give meaning to each provision. *See* 13 Appleman, *Insurance Law and Practice* § 7383, at 30–37 (1976 & Supp.1987). We further note that a finding that clause 5(b) excluded from coverage illegal remuneration would render the 5(c) exclusion superfluous because any payments excluded by 5(c) would of necessity also be excluded by the terms of 5(b). Accordingly, we find the 5(b) exclusion is inapplicable to this case.

■ 7. Assuming *arguendo* that the construction of these two clauses could be construed so that the Plan and the Agreement would fall within the 5(b) exclusion as an illegal profit or advantage, we would still be compelled to find that the settlement payments are covered under the Policy because the Defendants were legally entitled to the payments under both the Plan and Agreement.

Specifically, Plaintiff contends that the approval and implementation of the Plan and Agreement was a waste of corporate assets because those who received the award provided no, or at least inadequate consideration for their payments. Moreover, Plaintiff contends that the awards under the Plan constitute illegal personal profit because the triggering event for the payments was not the loss of the Defendants' positions or change in their status, but merely the change in control of Southwest. Therefore, the Defendants were able to keep their positions, maintain their salary, and receive a sizable bonus merely because Southwest had been acquired. Further, Plaintiff suggests that the timing of the approval of the Plan suggests that the directors were involved with self-dealing.

Plaintiff's position requires us to confront a case of first impression. That is, whether the implementation of a "golden parachute"[3] agreement by a disinterested board of directors may be found to be a breach of their fiduciary duty to the corporation; or whether the adoption of the Plan and Agreement are protected from judicial interference by the business judgment rule. We conclude that the conduct of the Defendants fell within the proper scope of their authority and responsibility and therefore the payment of the *Strougo* settlement must be reimbursed under this Policy.

8. Our starting point in evaluating the conduct of Southwest's Board of Directors is Fla.Stat. § 607.111(4), which states that directors must perform their duties "in good faith, [and] in a manner [they] reasonably believe[s] to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances." Further, directors "incur no liability to the corporation for issues of business expediency which they resolve through the mere

**3.** "A golden parachute is an employment contract that guarantees lucrative financial settlements to corporate executives whose companies change control by acquisition or merger." E.

Hood & J. Benge, *Golden Parachute Agreements: Reasonable Compensation or Disguised Bribery?*, 53 UMKC L.Rev. 199, 200 n. 6 (1985).

exercise of their business judgment." *Schein v. Caesar's World, Inc.*, 491 F.2d 17, 18 (5th Cir.) (*citing Yarnall Warehouse & Transfer, Inc. v. Three Ivory Bros., Moving Co.*, 226 So.2d 887 (Fla. 2d DCA 1969); *Citizens National Bank of St. Petersburg v. Peters*, 175 So.2d 54 (Fla. 2d DCA 1965)), *cert. denied*, 419 U.S. 838, 95 S.Ct. 67, 42 L.Ed.2d 65 (1974); *see also Orlando Orange Groves Co. v. Hale*, 107 Fla. 304, 144 So. 674 (1932). These general statements delimit the parameters of a director's duty under Florida law, and the protections that are afforded by the business judgment rule.[4]

> Under the business judgment rule
>
> the law will not hold directors liable for honest errors, for mistakes of judgment, when they act without corrupt motive and in good faith.... [I]n order to come within the ambit of the rule, directors must be diligent and careful in performing the duties they have undertaken; they must not act fraudulently, illegally, or oppressively, or in bad faith.

3A Fletcher, *Cyclopedia Corporations*, § 1039, at 45 (perm. ed. 1986) (footnotes omitted). However, this rule may not be used to shield directors from liability for excessive salaries which "amount to spoliation or waste of corporate property[,]" *Rogers v. Hill*, 289 U.S. 582, 591, 53 S.Ct. 731, 735, 77 L.Ed. 1385 (1933), or from other forms of self-dealing, including enacting measures in order to ensure the maintenance of their control of the corporation. *See, e.g., Norlin Corp. v. Rooney, Pace, Inc.*, 744 F.2d 255, 264–65 (2d Cir.1984); *Minstar Acquiring Corp. v. AMF Inc.*, 621 F.Supp. 1252, 1259–61 (S.D.N.Y.1985).

The question here is whether the decision by the board of directors in adopting the Plan violated the duty of loyalty it owed Southwest. Stripped to its essentials, the articulated rationale and purpose behind the enactment of the Plan was to keep intact a management team that had proven quite successful and had created a very profitable corporation. In pursuit of this end, the board enacted measures which were meant to induce the beneficiaries to remain with Southwest.[5] "Most commentators agree that the 'business judgment rule' of current corporation law applies to golden parachutes." Note, *Golden Parachutes and the Business Judgment Rule: Toward a Proper Standard of Review*, 94 Yale L.J. 909, 912 & n. 17 (1985). Since we have already determined that the board was a disinterested one, we are left to consider only whether the change of control clause which provided for payment of the bonus, even though the recipients kept their positions with the merged company, created an illegal profit amounting to corporate waste.

Considering this case under the business judgment rule, we begin with the presumption that the directors exercised good faith and their best business judgment in adopting the Plan.

> Ordinarily, employee compensation and other corporate payments are not a waste or gift of assets as long as fair consideration is returned to the corporation. The question of adequacy of consideration is committed to the sound business judgment of the corporation's directors. Thus, a plaintiff attacking a corporate payment has the heavy burden of demonstrating that no reasonable

---

**4.** We note in passing that the Florida legislature has recently passed Act approved June 30, 1987, ch. 245, 1987 Fla.Laws 329, which created greater protections from liability for official acts in their capacity of corporate officers and directors. *See* Fla.Stat.Ann. §§ 607.1645, 607.165 (West Supp.1988); *see generally Senate Staff Analysis and Economic Impact Statement*, Senate Bills 1096, 963 & 654 (April 27, 1987). That act

> shall take effect July 1, 1987 ... and shall apply to all causes of action accruing on or after the effective date of this act. Nothing in this act shall affect the validity of any bylaw

agreement, vote of shareholders or disinterested directors, or otherwise pursuant to § 607.014 F.S. before the effective date of this act.

Act approved June 30, 1987, ch. 245, § 13, 1987 Fla.Law 329, 351. Accordingly, this new legislation is inapplicable to the case at bar.

**5.** *See generally* E. Hood & J. Berge, *supra* note 2, at 204–05 (retention of executives as a rationale for the golden parachute); R. Profusek, *Executive Employment Contracts in the Takeover Context*, 6 Corp.L.Rev. 99, 101 (1983) (same).

businessman could find that adequate consideration had been supplied for the payment.

*Cohen v. Ayers*, 596 F.2d 733, 739 (7th Cir.1979) (footnotes omitted). We note again that it was a disinterested board that adopted this Plan, and that the Plaintiff may only prevail by demonstrating that the business judgment rule does not apply in this case because there was insufficient consideration to support the Plan award. Moreover, it must be emphasized that Plaintiff here is actually challenging the propriety of any award under the Plan. However, the controversy at bar revolves not on a $4,000,000 payment under the Plan to seven officers and directors, but International's liability to indemnify these Defendants for a $600,000 settlement payment. So, while International is heard to challenge all payments under the Plan, Plaintiff is not a shareholder challenging the conduct of the board. International's Complaint relates only to the amount for which it may be liable. The settlement of the *Strougo* litigation essentially resolved the claims of corporate waste with respect to $3,400,000 of the Plan payments. We can only conclude that International is now contending that the balance, or $600,000, was an illegal profit, awarded without sufficient consideration.

With regard to Plaintiff's allegations as to corporate waste

> [t]wo basic rules permeate the cases involving the issue of reasonable compensation. First, the compensation to be paid to corporate officers (in this case, golden parachute benefits) must bear a reasonable relationship to the value of the services rendered as consideration for such compensation. Second, the corporation must be reasonably assured that the contemplated consideration will, in fact, flow to the corporation.

E. Hood & J. Benge, *Golden Parachute Agreements: Reasonably Compensation of Disguised Bribery?*, 53 UMKC L.Rev. 199, 222–23 (1985) (footnotes omitted). Plaintiff here contends that because the Plan provided for payment once there was a change in control of Southwest and not on the recipient's termination, the consideration provided by these Defendants was insufficient because the payments were not in a reasonable relationship to the services the Defendants provided. We disagree and emphasize that the rationale underlying the enactment of the Plan was to maintain the management group during an important period of development for Southwest. "Sufficient consideration to the corporation may be ... the retention of the services of an employee ... provided there is a reasonable relationship between the value of the services to be rendered by the employee and the value of the ... inducement or compensation." *Kerbs v. California Eastern Airways, Inc.*, 90 A.2d 652, 656 (Del. 1952) (citations omitted).

Simply stated, the Plan compensated these Defendants for staying with Southwest until the merger. The challenged compensation is $600,000. We cannot say that this award is without reasonable relation to the services provided during the pre-merger period and represents inadequate consideration for remaining with Southwest during this period. We note that this Plan does have its troubling aspects. The fact that the Plan was adopted during a period when a merger was contemplated, and the Plan does not include a termination provision as a triggering event for payment does provoke questions regarding the adequacy of the relationship between the consideration provided and the compensation awarded. However, we are unconvinced that this Plaintiff has met its burden of establishing that the amount in controversy represents an unreasonable compensation for the services of these Defendants, such that we should not defer to the business judgment of Southwest's Board. Moreover, the consideration sought was in fact obtained by Southwest. The management team did remain intact during the pre-merger period. We cannot independently evaluate the monetary benefits to the Company or its shareholders from that accomplishment and substitute our judgment.

9. The analysis of the propriety of the Agreement is similar to that used to consider the Plan. The Agreement was approved

by the board of directors and stockholders of both Southwest and Landmark. The Agreement had specific provisions as to Johns' obligation under this contract. Under the business judgment rule, we decline to hold that the considered judgment of two boards of directors created a consulting contract which provided compensation that had no reasonable relationship to the consideration provided. The proceeds under the Agreement cannot be considered an illegal profit or advantage that falls within the 5(b) exclusion of the Policy.

10. Having determined that the Defendants are entitled to coverage for the settlement payments in the *Strougo* litigation, we find that they are, under the Policy, also entitled to be fully reimbursed for the defense costs in that action.

11. Damages in this action consist of four components and shall be awarded in the amounts computed below.

a. Plaintiff is liable to the Defendants for the $600,000 *Strougo* settlement payment and prejudgment interest calculated from May 1985 on that amount at the rate of 12 percent per annum. "Under Florida law ... prejudgment interest is allowed only on liquidated claims.... [W]here a sum certain is involved 'it is proper to allow interest at the legal rate from the date the debt was due despite an honest and bona fide dispute as to the debt.'" *Cioffe v. Morris*, 676 F.2d 539, 543 (11th Cir.1982) (*quoting Broward County v. Sattler*, 400 So.2d 1031, 1033 (Fla. 4th DCA 1981)) (other citations omitted); *see also Argonaut Insurance Co. v. May Plumbing Co.*, 474 So.2d 212, 214–15 (Fla.1985); *Underwriters Insurance Co. v. Kirkland*, 490 So.2d 149, 153–54 (Fla. 1st DCA 1986). The legal rate of interest is 12 percent a year. Fla.Stat. Ann. § 55.03 (West Supp.1988).

b. Plaintiff is liable to Defendants for the unreimbursed costs of the *Strougo* defense in the amount of $42,179.23 plus prejudgment interest calculated from May 1985.

c. Plaintiff is liable to Defendants for the present value of the payments Mr. Johns would have received under the Agreement. On or about April 25, 1984, Southwest and Johns entered into the Agreement which called for Johns to be paid $225,000 per year for five years. Under that contract, Johns would have continued to receive payment until approximately April 25, 1989. Since the duration term was halved pursuant to the *Strougo* settlement, payments therefore would have continued only until October 25, 1986. Accordingly, as of the date of this Order, Mr. Johns has forgone the receipt of approximately $337,500 and would be due another $225,000 through April 25, 1989. The value of this loss is $337,500 plus the present value of the $225,000 due, calculated at an annual rate of six percent.

d. Attorney's fees: Under Fla.Stat.Ann. § 627.428(1) "[u]pon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of any named ... insured, the trial court ... shall adjudge a decree against the insurer and in favor of the insured a reasonable sum as fees or compensation for the insured's ... attorney prosecuting the suit in which recovery is had." Therefore, Defendants are entitled to reasonable attorney's fees as a measure of damages.

Accordingly, it is

ORDERED AND ADJUDGED as follows:

1. Plaintiff is liable to Defendants in the amount of $1,423,113.75 [6] and reasonable attorney's fees and costs.

---

6. The total award is calculated as follows

| | | |
|---|---|---:|
| a. | Cash settlement payment | $600,000.00 |
| | Prejudgment interest thereupon at 12% per year for 36 months. | $216,000.00 |
| | | **$816,000.00** |
| b. | Unreimbursed defense costs | $ 42,179.23 |
| | Prejudgment interest thereupon at 12% per year for 36 months | $ 15,184.52 |
| | | **$ 57,363.75** |
| c. | Present value of lost consulting fee: | |
| | Payments due as of the date of this Order | $337,500.00 |

2. Defendants shall submit within twenty (20) days, affidavits as to the amount of reasonable attorney's fees and costs sought in this action. Plaintiff may respond to such affidavits within twenty (20) days thereafter.

| | | |
|---|---|---|
| Present value of $225,000 payment due on or about April 25, 1989 calculated at 6% per year | $212,250.00 | $549,750.00 |
| | TOTAL | $1,423,113.75 |