United States Court of Appeals,

Eleventh Circuit.

No. 94-4684.

FEDERAL DEPOSIT INSURANCE CORPORATION, as manager of the Federal Savings and Loan Insurance Corporation Resolution Fund, Plaintiff-Appellant, Cross-Appellee,

v.

Angelique O. STAHL, Ralph F. Cheplak, Defendants-Appellees, Cross-Appellants,

Ross P. Beckerman, W. George Allen, Defendants-Appellees,

Ira C. Hatch, Jr., Allen E. Baer, Ronald M. Bergeron, Sr., Defendants.

Aug. 2, 1996.

Appeals from the United States District Court for the Southern District of Florida. (No. 91-7122-CIV), Wilkie D. Ferguson, Jr., Judge.

Before HATCHETT and BLACK, Circuit Judges, and CLARK, Senior Circuit Judge.

BLACK, Circuit Judge:

The Federal Deposit Insurance Corporation (FDIC) filed this action against former officers and directors of Broward Federal Savings and Loan Association (Broward), alleging, *inter alia,* negligence in relation to seven target loans approved by the directors. Defendants filed a motion to dismiss, and also moved for summary judgment contending that the FDIC's claims with respect to all seven, or alternatively, two, of the target loans were time-barred. These motions were denied.

The case proceeded to trial against four directors: Angelique Stahl, Ralph Cheplak, Ross Beckerman and W. George Allen.[1]

_____

[1]On the eve of trial, the FDIC settled with three of the original seven defendants: Ira Hatch, Allen Baer and Ronald

Following trial, the jury entered a general verdict in the amount of $18.6 million in favor of the FDIC against Stahl and Cheplak, and returned no liability verdicts for Beckerman and Allen. Thereafter, the district court entered an order setting aside the jury verdict as to Stahl and Cheplak and, in the alternative, conditionally granting them a new trial on the grounds that the FDIC presented incompetent evidence and made a prejudicial closing argument at trial.

The district court subsequently entered a "take-nothing" judgment in favor of all four directors from which the FDIC now appeals.[2] Stahl and Cheplak cross-appeal on the bases that the district court both improperly instructed the jury that an ordinary negligence standard of care governed the actions of the directors, and erred in denying summary judgment when claims relating to two of the target loans were time-barred. We affirm the district court's judgment as to all claims except those of the FDIC contending that the district court erred in setting aside the jury verdict as to Stahl and Cheplak and, in the alternative, conditionally granting them a new trial. We reverse the judgment as to those claims and remand the case for further proceedings.

## I. BACKGROUND[3]

Bergeron.

[2]In this opinion, we address the FDIC's claims only as to Stahl and Cheplak. The FDIC's challenge to the district court's judgment in favor of Allen and Beckerman is without merit and does not require discussion. *See* 11th Cir.R. 36-1.

[3]Since the district court set aside the jury verdict and entered judgment as a matter of law in favor of the directors, we have presented the evidence and construed all inferences in a light most favorable to the FDIC. *See Miles v. Tennessee River*

Broward was a savings and loan association which opened in 1978.  Stahl, who had no banking experience, served as chairman of the board, and Allen and Beckerman served as directors.  Later, Broward promoted Stahl to the position of chief executive officer and hired Cheplak, who had limited lending experience, as its president.  Stahl and Cheplak approved, and the board ratified, the seven loans at issue in this case.

Federal regulators warned Broward in 1983 of the risks associated with the rapid growth strategy it had adopted.  Broward was paying high interest rates in order to attract depositors, but such growth placed pressure on the institution to reinvest these funds in high-yield assets such as commercial real estate loans in order to cover costs.  In rapidly expanding its real estate loan portfolio, Broward made a large volume of risky loans.

The Federal Home Loan Bank Board (FHLBB), the federal agency which regulated thrifts, periodically reviewed Broward's financial condition to ensure compliance with FHLBB regulations and policies. Roslyn Hess, an examiner with over 13 years' experience, and Debra Paradice, an agent with 19 years' experience, began their regulatory oversight of Broward in 1983.  Based on 1982 and 1983 reviews of a number of Broward's major loans, federal regulators found deficiencies in its loan underwriting and appraisal procedures.

In 1984, these deficiencies worsened.  Consequently, the federal regulators required Broward's board to execute a Supervisory Agreement promising to take action to eliminate the

*Pulp and Paper Co.,* 862 F.2d 1525, 1528 (11th Cir.1989).

weaknesses.  The Supervisory Agreement provided that before extending credit, Broward would take certain precautions.[4] Thereafter, the Broward board adopted new lending guidelines and policies as set out in the Supervisory Agreement.

In addition to the regulatory problems, internal audit reports also revealed deficiencies in Broward's lending practices.  Even Beckerman acknowledged these underwriting deficiencies in a letter to Stahl dated July 1985.  In October 1985, MCS Associates, a thrift consulting firm, reviewed the lending policies Broward adopted with the execution of the Supervisory Agreement.  MCS noted that Broward's policies would be successful if implemented, but did not review Broward's actual lending practices.  The managing director of MCS, D. James Croft, discovered that Broward had made several loans after the Supervisory Agreement had been executed but before the new policies were actually implemented which violated both the agreement and the new loan procedures.  Croft concluded Broward was not prepared to make those loans at that time, and exposed itself to a high degree of risk by doing so.

Six of the loans at issue in this case were made after the Supervisory Agreement was executed.  Hess reviewed these loans and found numerous violations of prudent loan practices, the

---

[4]These included obtaining:  (1) financial reports demonstrating an ability of the borrower/guarantor to repay the loan;  (2) equity of the borrower in security property;  (3) specifications for real estate development projects;  (4) feasibility studies showing the project securing the loan could generate enough capital to repay the loan;  and (5) an appraisal meeting the requirements of R 41b, an FHLBB guideline for loans secured by real estate.

Supervisory Agreement and Broward's new lending policies.[5]  Hess did not review one of the seven loans in this lawsuit, but as approved it was not expected to produce positive cash flow for five years and required a $1.6 million interest/loss reserve.  On November 15, 1985, the FHLBB concluded that Broward was insolvent, in part due to loan losses.  Broward lost approximately $34 million on the seven loans which the FDIC sought to recover in this action.[6]

## II. ISSUES PRESENTED

There are four issues raised by the parties in this appeal/cross-appeal which merit our consideration:  (1) whether the district court erred in determining that an ordinary care standard governed the actions of the directors;  (2) whether the district court erred in entering judgment for Stahl and Cheplak notwithstanding the verdict;  (3) whether the district court erred in conditionally granting Stahl and Cheplak a new trial on the bases of the FDIC's use of incompetent evidence and prejudicial closing argument;  and (4) whether Stahl and Cheplak are entitled to a new trial on the ground that claims relating to two of the target loans were barred by the statute of limitations.

## III. STANDARD OF REVIEW

In reviewing a judgment as a matter of law, we apply the same

---

[5]These deficiencies included, *inter alia,* no proof of borrower equity, financial statements demonstrating inability to repay loans, and a lack of feasibility studies.

[6]Pursuant to an assistance agreement, the Federal Savings and Loan Insurance Corporation (FSLIC) reimbursed the institution that acquired Broward for losses on the seven loans.  The FDIC succeeded to the FSLIC's rights and obligations under this agreement.

standard as the district court in deciding the motion. *Miles v. Tennessee River Pulp and Paper Co.,* 862 F.2d 1525, 1528 (11th Cir.1989). A judgment notwithstanding the verdict (JNOV) should only be entered if, in viewing all the evidence and construing all inferences in a light most favorable to the nonmoving party, the court finds no reasonable juror could have reached the verdict returned. *Id.; Rosenfield v. Wellington Leisure Prods., Inc.,* 827 F.2d 1493, 1494-95 (11th Cir.1987) (quoting *Reynolds v. CLP Corp.,* 812 F.2d 671, 674 (11th Cir.1987)).

A ruling on a motion for a new trial is generally reviewable for abuse of discretion. *Rosenfield,* 827 F.2d at 1498 (citing *Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d 360, 362 (5th Cir.1980)). When a new trial is granted, however, we apply a more stringent application of the same standard. *Jackson v. Pleasant Grove Health Care Ctr.,* 980 F.2d 692, 695 (11th Cir.1993) (citing *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir.1984)).

## IV. DISCUSSION

A. *Standard of care*[7]

The threshold question in this case is what standard of care governed the actions of the directors. The FDIC argues the district court properly instructed the jury that the applicable

---

[7]In ruling on Defendants' motion to dismiss, the district court determined that a simple negligence standard governed the directors' actions in this case. In its order setting aside the jury verdict, the court considered this earlier determination to be "the law of the case." This is incorrect. Since the denial of Defendants' motion to dismiss was not a final judgment, the decision regarding the standard of care was not the law of the case. *See Vintilla v. United States,* 931 F.2d 1444, 1447 (11th Cir.1991). Thus, we must determine whether simple negligence is in fact the appropriate standard of care to apply in this case.

standard of care under Florida law at the time of the alleged misconduct was ordinary or reasonable care, but mischaracterized the requirements of the due care standard in setting aside the jury verdict. Stahl and Cheplak counter that only federal law should have dictated the standard of liability for the directors, which, they argue, would have imposed a gross negligence burden of proof upon the FDIC. On this basis, Stahl and Cheplak contend a new trial is warranted. Stahl and Cheplak argue in the alternative that even if it was proper to utilize Florida law establishing a simple negligence standard of liability, Florida's business judgment rule (BJR) still elevates the standard to the level of gross negligence. In this scenario, Stahl and Cheplak maintain the FDIC failed to overcome the protection afforded to directors under the BJR, and contend the district court's judgment as a matter of law should therefore be affirmed. In our analysis, we will first determine whether federal or state law governs the standard of care for director liability. Then we will examine what interplay the BJR has, if any, in relation to the appropriate standard.

Stahl and Cheplak contend the FDIC's claims against the directors in this case are governed by federal law dictating a gross negligence standard of director liability. Their argument is best viewed in a streamlined, step-by-step fashion. First, Stahl and Cheplak note that Broward was a federally chartered, regulated, and insured savings and loan association. Second, they contend that the Home Owners' Loan Act (HOLA) [8] dictates that all federal banking law preempts state law with respect to federal

—————————————————

[8] 12 U.S.C. § 1461, *et seq.* (1994).

institutions. Finally, they argue § 212(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), 12 U.S.C. § 1821(k) (1994), established a gross negligence standard governing the actions of directors. Combining these three elements, Stahl and Cheplak reason that federal banking law preempts state law under HOLA, and therefore a gross negligence standard should be used to establish the FDIC's burden of proof pursuant to § 1821(k).[9]

Stahl and Cheplak cite *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), in support of their argument that pursuant to HOLA, only federal law governs the standard of care for the directors in this case. In *de la Cuesta,* the Supreme Court held that a state statute directly in conflict with an FHLBB regulation was preempted, finding the federal regulation "was meant to pre-empt conflicting state limitations...." 458 U.S. at 159, 102 S.Ct. at 3025. Against this background, we examine § 1821(k), which states in relevant part:

> A director or officer of an insured depository institution may be held personally liable ... for gross negligence ... as such terms are defined and determined under applicable State law. Nothing in this paragraph shall impair or affect any right of the Corporation under other applicable law.

---

[9]The district court found that the alleged acts of negligence in this case occurred between October 1984 and January 1986. FIRREA was not enacted until 1989. Pub.L. No. 101-73, § 1, 103 Stat. 183 (1989). Thus, Stahl and Cheplak are really asking this Court to retroactively apply a standard of gross negligence under § 1821(k) to preempt Florida law in the area of director liability. We decline to resolve this issue, finding that even if retroactive application of FIRREA is appropriate, the question still remains as to whether the FDIC may bring a claim under Florida law utilizing a standard of simple negligence.

12 U.S.C. § 1821(k).

While § 1821(k) provides that a director may be held liable for gross negligence, the FDIC contends that Congress enacted the last sentence of the statute to permit courts to decide whether to apply state law to federally chartered financial institutions. We reach the same conclusion. That is, we find that the "saving language" in the last sentence of the statute enables claims under "other applicable law," i.e., state law for simple negligence, to survive the enactment of FIRREA. Indeed, the Supreme Court in *de la Cuesta* specifically declined to hold that federal regulations would preempt all state laws, *de la Cuesta,* 458 U.S. at 159 n. 14, 102 S.Ct. at 3025 n. 14, and Stahl and Cheplak themselves concede courts have not found that federal law occupies the entire field in the regulation of federal thrifts under HOLA.[10]

The Supreme Court has clearly held that because of federalism concerns, greater evidence of congressional intent is required to preempt state law than federal common law. *City of Milwaukee v. Illinois & Michigan,* 451 U.S. 304, 316, 101 S.Ct. 1784, 1792, 68 L.Ed.2d 114 (1981). While Stahl and Cheplak cite cases holding that the gross negligence standard established in § 1821(k) should

---

[10]Independent of HOLA preemption, Stahl and Cheplak put forth two alternative bases under which this Court could find that federal law alone governs the liability of corporate directors. First, in *RTC v. Chapman,* 29 F.3d 1120 (7th Cir.1994), the Seventh Circuit relied upon a choice of law principle known as the internal affairs doctrine in finding that national law must govern the internal affairs of a federally-chartered institution in order to achieve uniformity. 29 F.3d at 1122-23. Second, Stahl and Cheplak argue that a minority of courts have held that § 1821(k) preempts state law claims not just for federal institutions, but for state institutions as well. These claims are without merit and do not warrant discussion.

be used to displace *federal* common law, *see RTC v. Frates,* 52 F.3d 295, 296 (10th Cir.1995); *RTC v. Miramon,* 22 F.3d 1357, 1360 (5th Cir.1994); *FDIC v. Bates,* 42 F.3d 369, 370 (6th Cir.1994); *RTC v. Gallagher,* 10 F.3d 416, 425 (7th Cir.1993), the majority of our sister circuits have either specifically declined to reach the question of whether § 1821(k) preempts *state* common law, *see, e.g., Miramon,* 22 F.3d at 1359 n. 2; *Gallagher,* 10 F.3d at 424, or have held it does not. *See FDIC v. McSweeney,* 976 F.2d 532, 537 (9th Cir.1992), *cert. denied,* 508 U.S. 950, 113 S.Ct. 2440, 124 L.Ed.2d 658 (1993).[11] *Frates* is particularly illustrative of this distinction. In *Frates,* the Tenth Circuit held that § 1821(k) supersedes federal common law predicating liability upon simple negligence, while specifically reaffirming its holding in *FDIC v. Canfield,* 967 F.2d 443, 448 (10th Cir.) (en banc), *cert. dismissed,* 506 U.S. 993, 113 S.Ct. 516, 121 L.Ed.2d 527 (1992), in which it concluded § 1821(k) does not preempt state law simple negligence claims against directors. *Frates,* 52 F.3d at 296-97.

More specifically, the *Canfield* and *McSweeney* courts found that § 1821(k) does not preempt state law establishing a lesser standard of fault than gross negligence. *Canfield,* 967 F.2d at 447; *McSweeney,* 976 F.2d at 539. The legislative history of § 1821(k) supports this theory, stating that Congress intended § 1821(k) to preempt the applicability of state insulating statutes which effectively shielded corporate management from personal

---

[11]*See also RTC v. Cityfed Fin. Corp.,* 57 F.3d 1231, 1249 (3d Cir.1995) (holding § 1821(k) does not preempt either state *or* federal common law), *cert. granted,* --- U.S. ----, 116 S.Ct. 1415, 134 L.Ed.2d 541 *and cert. dismissed,* --- U.S. ----, 116 S.Ct. 1587, 134 L.Ed.2d 684 (1996).

liability for grossly negligent actions. 135 Cong.Rec. S4278-79 (daily ed. Apr. 19, 1989) (statement of Senator Riegle). Further, while the Supreme Court has determined that § 1821(k) permits claims against directors for gross negligence "regardless of whether state law would require *greater* culpability," *O'Melveny & Myers v. FDIC,* --- U.S. ----, ----, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994) (emphasis supplied), it has not found Congress also intended to preempt state laws imposing liability upon directors for *lesser* culpability, i.e., simple negligence. If Congress had intended to establish a uniform gross negligence standard of liability in § 1821(k), it certainly could have done so more clearly. Based upon the above reasoning, we are satisfied that § 1821(k) does not preempt state laws with lesser liability standards than gross negligence.

We now must look to the state law that controlled at the time the negligent acts were allegedly committed in order to determine the standard of liability applicable to the directors in this case. The district court instructed the jury that the appropriate standard of care was ordinary negligence, and that due care was an element of Florida's BJR. For the reasons detailed below, we agree.

The alleged acts of negligence occurred between October 1984 and January 1986. Prior to 1987, the Florida standard of liability for corporate directors was governed by Fla.Stat. § 607.111(4) (1987). As set forth in *International Ins. Co. v. Johns,* 685 F.Supp. 1230 (S.D.Fla.1988), *aff'd,* 874 F.2d 1447 (11th Cir.1989), this standard provided that directors were to perform their duties

"in good faith ... in a manner ... reasonably believe[d] to be in the best interests of the corporation, and *with such care as an ordinarily prudent person in a like position would use under similar circumstances.*"  685 F.Supp. at 1237 (emphasis supplied) (quoting Fla.Stat. § 607.111(4)).  We find Fla.Stat. § 607.111(4), in effect at the time the alleged negligent acts were committed in this case, clearly established an ordinary negligence standard of director liability.[12]

Stahl and Cheplak argue that even if a simple negligence standard of liability prevailed in Florida under Fla.Stat. § 607.111(4) prior to 1987, Florida's BJR elevates such a standard to the level of gross negligence.  The BJR has been defined to mean the following:

> [T]he law will not hold directors liable for honest errors, for mistakes of judgment, when they act without corrupt motive and in good faith ... *[I]n order to come within the ambit of the rule, directors must be diligent and careful in performing the duties they have undertaken;*  they must not act fraudulently, illegally, or oppressively, or in bad faith.

*Id.* at 1238 (emphasis supplied) (quoting 3A Fletcher, *Cyclopedia Corporations,* § 1039, at 45 (perm. ed. 1986)).

In support of their argument, Stahl and Cheplak cite *FDIC v. Mintz,* 816 F.Supp. 1541 (S.D.Fla.1993), in which the court interpreted the BJR as follows:

---

[12]The Florida legislature passed Fla.Stat. § 607.1645 (1987), presently codified at Fla.Stat. §§ 607.0830, 607.0831 (1989), to afford corporate officers and directors greater protection from liability;  however, these heightened liability standards apply only to causes of action accruing on or after July 1, 1987. *See Johns,* 685 F.Supp. at 1238 n. 4 (citing Act of June 30, 1987, ch. 245, § 13, *repealed by* Act of 1989, ch. 154, § 166;  Act of 1990, ch. 179, § 189).  Thus, such legislation is inapplicable to the case at bar.

> Although directors must act with diligence and due care (seemingly setting out a simple negligence standard), they are only liable when they "act fraudulently, illegally, or oppressively, or in bad faith'.... These terms indicate that liability will attach only to acts which constitute gross negligence and intentional conduct. Because courts will not substitute their judgment in place of a corporation's directors, the simple negligence of a director cannot be reviewed....
>
> The result of the application of the [BJR] in Florida is that the standard of liability for corporate directors is "gross negligence.'

816 F.Supp. at 1546 (citations omitted).

What the *Mintz* court has done is completely ignore the threshold requirement of the exercise of ordinary care under Fla.Stat. § 607.111(4) necessary "to come within the ambit of the [BJR]," *see Johns,* 685 F.Supp. at 1238 (quoting 3A Fletcher, *Cyclopedia Corporations,* § 1039, at 45 (perm. ed. 1986)), under the premise that courts must not "substitute their judgment" for that of directors. *Mintz,* 816 F.Supp. at 1546. We are not persuaded by the decision in *Mintz.*

"The [BJR] is a policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges." *International Ins. Co. v. Johns,* 874 F.2d 1447, 1458 n. 20 (11th Cir.1989). In this light, the BJR may be viewed as a method of preventing a factfinder, in hindsight, from second-guessing the decisions of directors. For directors to be entitled to the cloak of protection of the BJR on the merits of their judgments under pre-1987 Florida law, however, they still must have exercised due care in making them. *See Schein v. Caesar's World, Inc.,* 491 F.2d 17, 18 (5th Cir.) (finding that if directors exercise due care, they then

"incur no liability ... for issues ... they resolve through the mere exercise of their business judgment"), *cert. denied,* 419 U.S. 838, 95 S.Ct. 67, 42 L.Ed.2d 65 (1974);[13] *AmeriFirst Bank v. Bomar,* 757 F.Supp. 1365, 1376 (S.D.Fla.1991) (same). As articulated clearly by the court in *Casey v. Woodruff,* 49 N.Y.S.2d 625 (N.Y.Sup.Ct.1944):

> The question is frequently asked, how does the operation of the so-called "business judgment rule' tie in with the concept of negligence? There is no conflict between the two. When courts say that they will not interfere in matters of business judgment, it is presupposed that judgment—reasonable diligence—has in fact been exercised. A durector [sic] cannot close his eyes to what is going on about him in the conduct of the business of the corporation and have it said that he is exercising business judgment. Courts have properly decided to give directors a wide latitude in the management of the affairs of a corporation provided always that judgment, and that means an honest, unbiased judgment, is reasonable [sic] exercised by them.

49 N.Y.S.2d at 643.

In accordance with the foregoing rationale, we conclude the district court properly instructed the jury that due care was an element of the BJR. That is, under pre-1987 Florida law, directors must have acted with ordinary care for the BJR to apply. See *Johns,* 874 F.2d at 1461 & n. 27 (recognizing Florida's pre-1987 ordinary care statute as the basis for applying the BJR). If due care was in fact exercised as required under Fla.Stat. § 607.111(4), directors are protected by the BJR, no matter how poor their business judgment, unless they acted fraudulently, illegally, oppressively, or in bad faith. *See id.* Said differently, so long

---

[13]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

as due care was exercised, the BJR protects a "good director" (one who did not act fraudulently, illegally, oppressively, or in bad faith) who made an honest error or mistake in judgment, but not a "bad director" (one who acted fraudulently, illegally, oppressively, or in bad faith) who made a bad decision.

Consistent with the above, we hold the application of the BJR in Florida does not require that the FDIC establish gross negligence to sustain its burden in this case. While some courts such as *Mintz* have held the BJR elevates the simple negligence standard under Fla.Stat. § 607.111(4) to one of gross negligence, *Mintz,* 816 F.Supp. at 1546; *see also In re Southeast Banking Corp.,* 827 F.Supp. 742, 747 (S.D.Fla.1993) (holding that pre-1987 Florida law establishes a gross negligence standard), *rev'd on other grounds,* 69 F.3d 1539 (11th Cir.1995), we disagree. [14] *See FDIC v. Gonzalez-Gorrondona,* 833 F.Supp. 1545, 1556 (S.D.Fla.1993) ("[P]rior to July 1, 1987, the law of Florida imposed liability on corporate directors and officers for simple negligence"); *FDIC v. Haddad,* 778 F.Supp. 1559, 1567 (S.D.Fla.1991) ("Defendants' position that in general there is no cause of action against corporate directors under Florida law for "simple negligence' is unfounded.")

The court-made BJR does not change Florida's pre-1987 statutory simple negligence standard to a gross negligence

---

[14]Stahl and Cheplak rely on Delaware and District of Columbia law applying a gross negligence standard under the BJR. *See Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984); *Washington Bancorporation v. Said,* 812 F.Supp. 1256, 1269 (D.D.C.1993). Unlike pre-1987 Florida law, however, neither of these states had a general statute setting forth an ordinary care standard.

standard; it merely protects directors who exercised reasonable diligence in the first instance from liability on the merits of their business judgment, unless they acted fraudulently, illegally, oppressively, or in bad faith. Thus, based upon our above conclusion that § 1821(k) does not preempt state law establishing a lesser standard of fault than gross negligence, we hold the district court properly determined that the standard of care governing the actions of the directors in this case was ordinary negligence. Only if the directors met this standard were they entitled to the protection of the BJR.

B. *JNOV*

As noted above, the district court properly instructed the jury in this case that the appropriate standard of care was ordinary negligence, and that due care was an element of the BJR. Based upon the evidence presented at trial, the jury concluded Stahl and Cheplak had failed to exercise due care; therefore, they were not entitled to the protection of the BJR on the merits of their judgment.

In setting aside the jury verdict, however, the district court improperly characterized the standard of care and then reweighed the evidence to satisfy the standard in an attempt to bring the directors within the ambit of the BJR. Curiously pointing out that neither the Supervisory Agreement nor an FHLBB guideline, R 41b, "established a tort standard of care," the district court mischaracterized the due care standard apparently based upon its conclusion that this was "not a case where there was total indifference to standard underwriting practices." While it very

well may be true that the directors did not exhibit "total indifference" in the exercise of their business judgment, they need not have done so to be found liable under the ordinary negligence standard of care applicable in this case.

Only if the facts and inferences point so strongly and overwhelmingly in favor of Defendants that this Court believes that reasonable persons could not arrive at a contrary conclusion may we find the district court properly set aside the jury verdict. *See Reynolds v. CLP Corp.,* 812 F.2d 671, 674 (11th Cir.1987). On the other hand, if there is "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions," *id.* (quoting *Michigan Abrasive Co., Inc. v. Poole,* 805 F.2d 1001, 1004 (11th Cir.1986)), this Court should find the district court erred in entering judgment as a matter of law in favor of Defendants.

A court is not free to reweigh the evidence and substitute its judgment for that of the jury. *See id.* at 674-75. This, however, is precisely what the district court did in this case. After mischaracterizing the standard, the district court concluded the standard was satisfied based upon its own view of the evidence. Specifically, the district court was persuaded by the testimony of a regulatory attorney and Croft, who both stated Broward had good policies, and Cheplak, who the court found presented a "very credible defense." Finally, after determining that Stahl and Cheplak satisfied the appropriate standard of care, the district court found they were entitled to the benefits of the BJR and set aside the jury verdict.

The jury in this case apparently just did not find this testimony of the regulatory attorney, Croft and Cheplak as convincing as did the district court, and there appears to be ample support in the record to justify such a conclusion. While Croft characterized the management team as above average and the new lending policies well done, he still criticized Broward's implementation of the policies. The regulatory attorney never even reviewed Broward's underwriting, and Cheplak's testimony, of course, could be viewed by a jury as self-serving.

As the district court itself recognized, this is "a case where persons, on different sides of a dispute, disagreed as to whether Broward[ ]'s underwriting practices were adequate...." But, "the determination of negligence is ordinarily within the province of the trier of fact," *Decker v. Gibson Prods. Co. of Albany, Inc.,* 679 F.2d 212, 216 (11th Cir.1982), and based upon the evidence presented at trial, we are not convinced that no reasonable juror could find Stahl and Cheplak liable for failure to exercise due care. In yearly examination reports from 1982 through 1984, regulators criticized Broward's commercial loan underwriting and appraisal procedures, and ultimately required Broward to sign the Supervisory Agreement obligating it to exercise prudent lending standards. Hess, an examiner with over 13 years' experience, testified that in her examination of six of the target loans at issue in this case, she found numerous underwriting deficiencies which violated industry standards, the Supervisory Agreement, FHLBB appraisal standards (R 41b), and Broward's new lending policies. If believed, this evidence could create an inference that the

directors failed to exercise due care in accelerating loan origination, approving the subject loans, and complying with the Supervisory Agreement and R 41b.

Viewing the facts in a light most favorable to the FDIC, we find substantial evidence of such quality and weight that fair-minded jurors exercising impartial judgment could reasonably have concluded Stahl and Cheplak failed to exercise due care with respect to the seven target loans. The basis for entering a JNOV should not be the judge's determination of which party has the better case. *Reynolds,* 812 F.2d at 674. We conclude the district court erred in entering judgment as a matter of law in favor of Stahl and Cheplak, and reinstate the jury verdict in favor of the FDIC.

C. *New trial*

1. *Evidence and closing argument.*

In the alternative, the district court conditionally granted Stahl and Cheplak a new trial on the grounds that they were prejudiced by the FDIC's summation, and the erroneous admission of incompetent evidence. There are two portions of the FDIC's closing argument which the district court maintains "had the effect of impairing the jury's dispassionate consideration of the case, and caused unfair prejudice to the defendants." The first relevant portion is as follows:

> What you have here is the directors were negligent and they breached their fiduciary obligation to the bank.... *Send the right message* to the directors around the country. They have to be accountable for their actions.

> If they are not held accountable for their conduct we'll never get out of this mess, this banking mess that the country has found itself in.

Trial Transcript at R23-168-24;  169-1 (emphasis supplied).

The district court cited *Vineyard v. County of Murray, Ga.,* 990 F.2d 1207, 1213 (11th Cir.), *cert. denied,* 510 U.S. 1024, 114 S.Ct. 636, 126 L.Ed.2d 594 (1993), as an example of a case in which a similar "send the message" closing argument was made.  In *Vineyard,* this Court analyzed whether, in light of "the entire argument, the context of the remarks, the objection raised, and the curative instruction," the statement at issue was "such as to impair gravely the calm and dispassionate consideration of the case by the jury."  990 F.2d at 1213 (quoting  *Allstate Ins. Co. v. James,* 845 F.2d 315, 318 (11th Cir.1988)).  "[R]eluctant to set aside a jury verdict because of an argument made by counsel during closing arguments," *id.* at 1214, this Court in *Vineyard* affirmed the district court's denial of the motion for mistrial.

The district court in this case maintains the *Vineyard* court decided the case the way it did only because it was satisfied the curative instruction sufficiently eliminated any resulting prejudice from the remark.  Here, by contrast, Allen was the only defendant to even object to the remark, none of the other defendants requested a curative instruction, and the district court admits it did not give one, "certain that a curative instruction would have been ineffective."  While a curative instruction does not always remedy the harm of an improper closing argument, *see McWhorter v. City of Birmingham,* 906 F.2d 674, 678 (11th Cir.1990), it is curious how the district court could be so certain that one would have been ineffective here, given that this Court has found "the influence of the trial judge "is necessarily and properly of

great weight and his lightest word or intimation is received with deference, and may prove controlling.' " *Allstate,* 845 F.2d at 319 (quoting *Quercia v. United States,* 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933)).

In light of the entire summation, the context of the remarks, the lack of objections and the district court's decision not to give a curative instruction, we conclude the "send the message" remark did not so unfairly prejudice Stahl and Cheplak as to warrant a new trial.

The second portion of the FDIC's summation which the district court maintains unfairly prejudiced Defendants is as follows:

> The only way we can insure that our depository institution[s] will be responsibly run is if we insist that the directors conduct themselves reasonably and discharge their duties diligently.
>
> To do otherwise will invite disaster not only for the banking system *but for the insurance fund and ultimately the taxpayer.*

Trial Transcript at R23-169-16 (emphasis supplied).

The district court found the FDIC's "taxpayer" reference prejudicial to Stahl and Cheplak on the grounds that it asked jurors to identify with the FDIC in the potential adverse effect of the decision, or implied the jurors had a financial stake in the outcome of the case. The court cited *Allstate* as an example of a case in which this Court reversed an order denying a motion for a new trial on the basis of a closing argument. In *Allstate,* the insurance company argued that the insured had caused or procured a fire to collect insurance proceeds, and stated in closing that the jurors were the "somebody" who could do something to prevent the higher insurance premiums which typically result from such cases.

*Allstate,* 845 F.2d at 319. Allstate further stated in summation that the jurors should treat the case "with all the attendant personal emotional responses." *Id.* This Court concluded that such a closing argument implied a "basis for the verdict other than the evidence presented," impairing the jury's calm and dispassionate consideration of the case. *Id.*

In examining the summation as a whole and the context of the remarks, *see Vineyard,* 990 F.2d at 1213, we find that the statements made by the FDIC's counsel in closing did not unfairly prejudice Stahl and Cheplak. Further, here again, Allen was the only defendant to object to the "taxpayer" remark, none of the other defendants requested a curative instruction, and the district court did not give one. In light of the foregoing, we conclude the FDIC's "taxpayer" reference was not so prejudicial to Defendants as to warrant a new trial.

As its final ground for ordering a new trial, the district court contends it erroneously admitted into evidence a transcript of a telephone conversation between Cheplak and employees of Drexel Burnham in which the Drexel employees criticized Broward's underwriting practices. The transcript had been admitted into evidence pursuant to a pretrial stipulation in which the parties agreed that all exhibits identified at deposition could be used at trial. The transcript was used at trial by the FDIC both to impeach Cheplak and in summation.

Only when the jury requested to see the transcript during its deliberations did the district court closely examine it and determine the document to be incompetent on four grounds: (1)

Defendants had not seen the transcript, (2) its authenticity had not been demonstrated, (3) recording of the conversation had not been authorized, and (4) the admission of the transcript violated the hearsay rule.  The district court instructed the jury to disregard the requested document, but states in its Order that it doubts the instruction had any effect given the return of verdict shortly thereafter.

As to the first two grounds of incompetency, we find Stahl and Cheplak were on notice of the transcript's existence and waived any authenticity claims by agreeing to the pretrial stipulation in the first instance.  This Court has affirmed the binding nature of pretrial stipulations which have been entered voluntarily and submitted to the court.  *Busby v. City of Orlando,* 931 F.2d 764, 771 n. 4 (11th Cir.1991).  Stahl and Cheplak counter that this pretrial stipulation is not binding because the district court never conducted a final pretrial conference nor approved the stipulation in a pretrial order;  however, pretrial conferences are not mandatory when, as here, the district court opts to proceed by calendar call.  S.D.Fla.Local Rules, Rule 16.1(E) (1994).

The district court effectively adopted the pretrial stipulation by conducting the trial proceedings consistent with it.  Thus, after permitting the FDIC to rely upon the transcript under the pretrial stipulation, during trial and summation, we conclude it was improper for the district court to strike the document after the case had gone to the jury on the basis of alleged defects the FDIC no longer had an opportunity to cure.

As to the third ground of incompetency, that the transcript

was inadmissible because its recordation was not authorized, this Court has found that under Florida law, all participants need not consent to the recording of a conversation if such recordation is done in the ordinary course of business. *See Royal Health Care Servs., Inc. v. Jefferson-Pilot Life Ins. Co.,* 924 F.2d 215, 218 (11th Cir.1991). Finding no evidence to suggest that the conversation contained in the transcript was anything but a routine business discussion regarding underwriting deficiencies at Broward, we conclude consent to the recordation was not necessary.

Finally, we disagree with Stahl and Cheplak's contention that the district court properly excluded the transcript on hearsay grounds. Finding the transcript was offered to show Cheplak's knowledge of Broward's underwriting problems, and not to establish the intrinsic truth of the matter asserted, we conclude the document was admissible. *See United States v. Parry,* 649 F.2d 292, 295 (5th Cir. Unit B June 1981).

2. *Statute of limitations.*

Stahl and Cheplak also claim they are entitled to a new trial on the ground that claims relating to two of the target loans were barred by the statute of limitations. Pursuant to 12 U.S.C. § 1821(d)(14)(A) & (B) (1994), this Court must determine whether the claims brought by the FDIC were viable under the applicable statute of limitations at the time the FDIC acquired the claims. *See RTC v. Artley,* 28 F.3d 1099, 1101 (11th Cir.1994). Florida Statute § 95.11(3)(a) (1995) provides a four-year statute of limitations for actions founded on negligence. Thus, the precise issue here is whether the claims regarding two of the target loans made before

December 31, 1984, known as the Cypresswood and Mason Center loans, were still viable at the time the FDIC acquired these claims more than four years later, on December 31, 1988.

The district court held the statute of limitations did not begin to run on the negligence claims until the date the loans went into default.[15] Stahl and Cheplak counter that several courts have held the statute of limitations begins to run when a negligent loan is made, not when it fails; but in support of this proposition, they rely on authority from jurisdictions other than Florida. *See, e.g., id.* at 1102 (recognizing that under Georgia law, statute of limitations begins to run when loans are made).

State law governs the viability of the FDIC's claims, *see id.* at 1101; therefore, Stahl and Cheplak's reliance on non-Florida law is misplaced. In Florida, "[a] cause of action accrues when the last element constituting the cause of action occurs." Fla.Stat. § 95.031(1) (1995). Accordingly, under Florida's "last element" rule, actions for negligence do not accrue until the plaintiff suffers some type of damage. *Wildenberg v. Eagle-Picher Indus., Inc.,* 645 F.Supp. 29, 30 (S.D.Fla.1986). Moreover, Florida courts have found that the limitations period does not begin to run

---

[15]In doing so, the district court distinguished *Corsicana Nat'l Bank v. Johnson,* 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919). In *Corsicana,* a bank director loaned money in violation of the National Bank Act, and the Supreme Court held the cause of action against the director accrued on the date the loan was made. 251 U.S. at 86, 40 S.Ct. at 90. The Court reached this conclusion because it determined the damage was complete at that time. *Id.* In the case at hand, however, the district court reasoned that Defendants' negligence caused cumulative damage to Broward which did not fully accrue until the loans were in default or the FDIC knew or should have known of the negligence. We agree.

until a plaintiff knew or should have known of the injury. *See, e.g., Lund v. Cook,* 354 So.2d 940, 941 (Fla.Dist.Ct.App.), *cert. denied,* 360 So.2d 1247 (Fla.1978). Indeed, in *Jones v. Childers,* 18 F.3d 899 (11th Cir.1994), we found:

> Florida courts ... have broadly adopted the discovery principle, holding in a variety of legal contexts that the statute of limitations begins to run when a person has been put on notice of his right to a cause of action. Generally under Florida law, a party is held to have been put on notice when he discovers, or reasonably should have discovered, facts alerting him of the existence of his cause of action.

18 F.3d at 906 (footnote omitted).

Stahl and Cheplak respond that jurisdictions like Florida which follow the "discovery rule" have nevertheless held a cause of action accrues when the pertinent loan is made rather than when it fails. *See, e.g., RTC v. Farmer,* 865 F.Supp. 1143 (E.D.Pa.1994). We find any such decisions contrary to the spirit of Florida's last element and discovery rules.

The damage in this case did not occur until the loans at issue were not repaid, at which point the FDIC should have been alerted to the existence of a negligence cause of action. Thus, we conclude the district court correctly determined that the statute of limitations did not begin to run on these claims until the loans failed. Since Stahl and Cheplak presented no summary judgment evidence showing when the borrowers defaulted on the loans, the district court appropriately denied summary judgment.[16]

---

[16]The FDIC also alleged a variety of circumstances that purported to establish claims for breach of fiduciary duty. Actions for breach of fiduciary duty, like negligence actions, do not accrue under Florida's last element rule until the plaintiff suffers some type of damage. *Penthouse North Assoc., Inc. v. Lombardi,* 461 So.2d 1350, 1352 (Fla.1984). Since the FDIC alleged such a wide range of fiduciary duty claims, however, the

# V. CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court setting aside the jury verdict as to Stahl and Cheplak and, in the alternative, conditionally granting them a new trial. In all other respects, we affirm the district court's judgment. Accordingly, we remand the case for further proceedings consistent with this opinion.

AFFIRMED in part; REVERSED in part; and REMANDED.

HATCHETT, Circuit Judge, concurring in part and dissenting in part:

Although I agree with the law this opinion announces and the reasoning in the opinion, I respectfully dissent in part. I would grant Stahl and Cheplak a new trial because the pre-1987 Florida law on the standard of care for directors was at best confusing. This opinion announces a clear standard to govern directors in this circuit. I fully concur in this standard; but, neither the district court nor the parties had the benefit of this standard at the trial of this case. In light of the confusion in our circuit law and the split in circuits, the district court followed the law of its district. Consequently, I would order a new trial for Stahl and Cheplak with this standard to be applied.

---

district court was unable to pinpoint when the damages in relation to each claim occurred, concluding it could have been "at the time of the default or perhaps at some time before default." Nevertheless, under Florida's discovery rule, the statute of limitations did not begin to run on the fiduciary duty claims until the FDIC knew or should have known of the alleged breaches. Since Stahl and Cheplak make no reference to the fiduciary duty claims on appeal, and presented no summary judgment evidence regarding when the FDIC knew or should have known of the alleged breaches, we conclude the district court properly denied summary judgment on this issue as well.